## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| IN THE MATTER OF THE SEARCHES OF: | |
|---|---|
| BLACK DODGE DURANGO BEARING PA LICENSE PLATE LNH4149 AND ANY CELLULAR TELEPHONE LOCATED INSIDE THE VEHICLE<br><br>(TARGET VEHICLE) | Magistrate No. 25-1923 |
| APPLE IPHONE POSSESSED BY DIOR RICHARDSON<br><br>(TARGET TELEPHONE) | Magistrate No. 25-1924 |

## <u>AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS</u>

I, Ryan P. O'Sullivan, being duly sworn, state as follows:

1.     I am a Special Agent of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), assigned to the Pittsburgh Field Office, Group II. I have been employed as an ATF Special Agent since September of 2015. While at the ATF National Academy, I received extensive training in investigating federal firearms, arson, explosives, and narcotics related violations, conducting surveillance, establishing probable cause, and executing search and arrest warrants.

2.     As an ATF Special Agent, I am an "Investigative or Law Enforcement Officer" of the United States within the meaning of Title 18, United States Code Section 2510(7); that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

3.     As an ATF Special Agent, I am responsible for enforcing Federal criminal statutes and am authorized to serve arrest and search warrants under the authority of the United States. I have participated in numerous federal and state search warrants related to firearms, arson,

explosives and narcotics violations, and I have assisted in the writing of affidavits to this effect.

4.     I have participated in criminal investigations with ATF as well as other federal, state and local law enforcement agencies relating to violations of various federal laws. I have been involved in firearms and narcotics-related arrests and the execution of search warrants and arrest warrants, which resulted in the seizure of firearms and narcotics and have assisted in the supervision of activities of confidential informants who provided information and assistance resulting in controlled purchases of firearms and narcotics.

5.     As an ATF Special Agent, I am familiar with the way in which individuals involved in illegal trafficking of firearms or and/or narcotics use cellular telephones, and that evidence can be obtained from the cellular telephones of individuals involved in that illegal activity.

6.     The information contained herein is based upon my own personal investigation, observations, and knowledge, as well as upon the investigation, personal observations, and knowledge of other law enforcement officers with whom I have discussed this case.  Because this Affidavit is being submitted for the limited purpose of establishing probable cause in support of a search warrant, I have not included every item of evidence or piece of information known to me; rather, I have included only those facts necessary to establish probable cause.

7.     For the reasons and to the extent detailed below, I am submitted this affidavit in support of search warrants for the following:

      a.     A black Dodge Durango bearing PA license plate LNH4149, referred to herein as the "TARGET VEHICLE", and further described in Attachment A-1, and any cellular telephone located inside the vehicle;

      b.     An Apple iPhone seized from Dior RICHARDSON, referred to herein as the "TARGET TELEPHONE", and further described in Attachment A-2;

8.    The TARGET VEHICLE and TARGET TELEPHONE may be collectively referred to as the "SEARCH LOCATIONS" throughout this Affidavit.

9.    Both the TARGET VEHICLE and TARGET TELEPHONE are currently secured in Pittsburgh Bureau of Police (PBP) custody.

10.    The purpose of these search warrants is to search the TARGET VEHICLE and TARGET TELEPHONE for evidence of violations of Title 21, U.S.C. § 841(a)(1), Title 18, U.S.C. § 922(g)(1) and Title 18, U.S.C. § 924(c), herein referred to as the "TARGET OFFENSES", further described in Attachment B.

11.    As set forth below there is probable cause to believe that the TARGET VEHICLE and TARGET TELEPHONE, will contain evidence of the TARGET OFFENSES, as described in Attachment B.

**PROBABLE CAUSE**

12.     On Thursday, November 20, 2025, ATF Special Agent's (SA's) Ryan O'Sullivan and Robert McGlennon were conducting a proactive patrol of the East Hills section of the City of Pittsburgh along with the Pittsburgh Bureau of Police (PBP) Violence Prevention Unit (VPU). Detective Abbondanza was operating a marked police vehicle along with SA McGlennon. Detective Flickinger was operating an unmarked police vehicle along with Detective Davies and SA O'Sullivan.

13.     At approximately 2100 hours, Detective Abbondanza and SA McGlennon were traveling North in the 2100 block of Park Hill Drive when they observed a black Dodge Durango bearing PA: LNH4149 (TARGET VEHICLE) traveling West in the opposite lane. The driver, and sole occupant, was later identified as Dior RICHARDSON. Detective Abbondanza and SA McGlennon could observe illegal window tint on the front windshield and front side windows of the TARGET VEHICLE which prevented them from viewing the interior of the vehicle and/or its occupants.

14. Detective Abbondanza maneuvered his patrol vehicle behind RICHARDSON as he crossed over onto Calistoga Place. RICHARDSON turned left on to Sonny Street. RICHARDSON activated his signal of intention just prior to making the turn, failing to activate it at, or prior to, the last 100 feet of the turn while turning onto Sonny Street. RICHARDSON then turned right onto Sherman Street while failing to come to a complete stop at the posted stop sign. RICHARDSON turned left onto East Swissvale Avenue where Detective Abbondanza activated his emergency lights and sirens to conduct a traffic stop in the 1500 block. RICHARDSON pulled to the right of the roadway and stopped his vehicle while partially rolling his driver window down. Detective Abbondanza could observe that RICHARDSON was a black male with a short haircut and wearing a neon green hoodie. Detective Abbondanza and SA McGlennon exited their vehicle. Detective Abbondanza asked RICHARDSON to roll down all of his windows due to the heavy tint to which RICHARDSON questioned, "All of them?" Detective Abbondanza responded in the affirmative at which point, RICHARDSON pulled back into the lane of travel without utilizing a turn signal and fled at a high rate of speed towards Penn Avenue.

15.    Detective Abbondanza and SA McGlennon reentered their marked patrol vehicle and proceeded behind RICHARDSON with emergency lights still activated for a brief period to make it known they were attempting to pull him over. RICHARDSON proceeded into the oncoming lane of travel and bypassed multiple vehicles on the left side. Once it was apparent that RICHARDSON had no intentions of stopping, Detective Abbondanza deactivated his emergency lights and reduced speed. However, RICHARDSON was heading towards a congested intersection that normally contains heavy vehicular and pedestrian traffic at East Swissvale Avenue and Penn Avenue. Detective Abbondanza and SA McGlennon attempted to monitor RICHARDSON while following his path of travel, believing that he would continue to create a substantial safety risk to the public. RICHARDSON'S speed was estimated to be upwards of 70-80mph. RICHARDSON was over two blocks in front of Detective Abbondanza's police vehicle as he ran the steady red indicator at this intersection. It appeared that RICHARDSON had lost control of his vehicle, however, since Detective Abbondanza and SA McGlennon were so far away, they could not clearly see what had happened. As Detective Abbondanza and SA McGlennon proceeded to the intersection, Detective Abbondanza reactivated his emergency lights and sirens once it was apparent that RICHARDSON had been involved in a collision.

16.    RICHARDSON had struck multiple vehicles and became entrapped in the TARGET VEHICLE. Detective Abbondanza advised dispatch that RICHARDSON had crashed and requested a code 3 police and medic response. RICHARDSON'S vehicle was resting on the driver's side. RICHARDSON was lying on his back, up against the driver's door and roof. Detective Abbondanza observed RICHARDSON reaching around aggressively in the interior of the vehicle. Detective Abbondanza placed RICHARDSON at gunpoint until additional units arrived on scene, while Special Agent McGlennon tended to the victims of the crash. Detective Abbondanza gave RICHARDSON verbal commands to stop moving and reaching around. RICHARDSON'S left hand was completely out of view, and his right hand would continuously go in and out of view while he continued to reach around.

17.    Moments later, Detective Flickinger, Detective Davies and SA O'Sullivan arrived on scene. SA O'Sullivan removed the sunroof from the TARGET VEHICLE and was able to slowly assist RICHARDSON with exiting the vehicle through the sunroof. SA O'Sullivan and Detective Flickinger restrained RICHARDSON behind his back using two sets of handcuffs linked together. RICHARDSON complained of head, neck, face, right eye and left leg pain and was transported to Allegheny General Hospital (AGH) by medics. U.S. currency and additional suspected controlled substances were recovered from RICHARDSON'S pants pockets at the hospital. RICHARDSON was cleared for incarceration by Dr. Murdock and transported to the Allegheny County Jail (ACJ) by Officer Evans.

18.    It should be noted the TARGET VEHICLE suffered substantial damage during the crash. Airbags were deployed on all sides, several components of the interior were mangled, and the gear shift knob was broken in half. As a result of this, parts of the interior were visible whereas others were not. Law enforcement was able to observe several items of clothing, a duffle bag and a backpack in the back seat.

19.    Two firearms were observed in plain view directly beside where RICHARDSON was located in the vehicle. A pistol was located on the driver's floorboard area, and a revolver was located in the center console area. Both firearms were removed from the vehicle and secured by law enforcement prior to the vehicle being flipped back over and towed. The firearms were identified as a loaded H.S. product pistol, model XD-40 compact 3.8, .40 caliber, SN: MG325169 and a loaded Charter Arms Corp. revolver, model Undercover, caliber .38 Special, SN: 603891. Both firearms were run through index and the H.S. product pistol returned as stolen out of Swissvale.

20.    Furthermore, multiple controlled substances were observed in plain view. Specifically, as RICHARDSON was removed from the vehicle, law enforcement observed a large pill bottle containing several suspected oxycodone pills. Law enforcement also observed multiple large bags of what appears to be marijuana in plain view underneath the front passenger seat as well as the middle seating row floorboard area.

21.    Detective Flickinger observed an Apple iPhone (TARGET TELEPHONE) in plain view which was observed ringing as it was positioned beside the brake pedal in the driver's floorboard area. Knowing that significant data can be lost if an Apple iPhone resets prior to forensic examination, Detective Flickinger reached into the TARGET VEHICLE and removed the TARGET TELEPHONE to plug it into a charger. Based upon the extremely mangled interior of the vehicle, law enforcement was unable to determine in there were any additional cellphones in the vehicle. I know based upon my training and experience that felons in possession of multiple firearms and various narcotics often utilize more that one cellphone.

22.    The TARGET VEHICLE was towed by McGann and Chester to the PBP Auto Squad where it is being held secure pending the application for a federal search warrant.

23.    RICHARDSON is prohibited from lawfully possessing firearms and ammunition due to numerous felony convictions, all of which are punishable by greater than one year of imprisonment.  RICHARDSON has felony convictions for firearm offenses and drug trafficking offenses.

24.    Based upon the several convictions referenced above, as well as the fact that RICHARDSON plead guilty to all of them and received multiple prison sentences in excess of one year, RICHARDSON knew that he was a convicted felon at the time of the incident that is the subject of this affidavit.

25.    I know through training and experience, as well as consulting with SA Robert McGlennon, who is an ATF interstate nexus expert, that H.S. Product and Charter Arms Corp. do not manufacture firearms in the Commonwealth of Pennsylvania, and therefore the firearms traveled in and affect interstate commerce prior to their recovery on this date.

26.     Accordingly, I submit that there is probable cause to believe that TARGET VEHICLE and TARGET TELEPHONE, will contain evidence of the TARGET OFFENSES.

**EVIDENCE LIKELY TO BE FOUND AT SEARCH LOCATIONS**

27.     Your Affiant is aware, based upon my training and experience, that the following types of evidence have been recovered in a substantial number of vehicle searches executed in connection with illegal firearms possession and drug trafficking investigations:

- Controlled substances, including but not limited to cocaine base (crack cocaine), cocaine, fentanyl, methamphetamine, oxycodone and marijuana;

- Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, stamp bags, heat-sealing devices, baking soda, cookware with residue, and dilutants;

- Books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances and to monetary transactions involving the proceeds from the sale of controlled substances;

- Personal books, papers, cellphones, and other electronic devices capable of sending/receiving communications and/or connecting to the internet (such as computers or tablets), as well as devices capable of storing digital content, such as USB/Flash Drives or external hard drives;

- Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances, money laundering, and the criminal use of communication facilities;

- Firearms, ammunition, and other dangerous weapons;

- Firearm and ammunition components and accessories, such as Glock "switches," sights, flashlights, holsters, magazines, ammunition boxes, firearm boxes;

- Other evidence of gun possession such as documents pertaining to firing ranges, gun clubs, firearms/ammunition purchases, firearms component/accessories purchases, etc.;

- Identification evidence and/or indicia, such as cell phones, mail, deeds, leases, rental agreements, photographs, bills, identification documents, etc., that tend to identify the person(s) in residence, occupancy, control, or ownership of the premises;

- Cash, currency, and records relating to the generation of income from the sale of controlled substances and the expenditure of such income, including money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, as well as consumer items such as expensive televisions and other electronic equipment, high-end vehicles, precious metals such as gold and silver, and precious gems such as diamonds (this evidence often is located in a safe) -- unexplained wealth is probative evidence of crimes motivated by greed, including trafficking in controlled substances.

28.     Based on my training and experience, I am aware that targets of narcotics trafficking investigations utilize cellular telephones and electronic devices to not only arrange meetings with their drug customers but also speak with fellow co-conspirators as well as their drug sources of supply. I am also aware that these targets also utilize multiple cellular telephones and electronic devices at one time in an effort to not only thwart detection by law enforcement but also to compartmentalize their drug trafficking customers to one phone and/or electronic device, their co-conspirators to another phone and/or electronic device, and their drug source of supply to yet another phone and/or electronic device.

29.     I am also aware that people in general, and those involved in firearms and/or drug trafficking (either as a distributor or customer) in particular, keep their cellular telephones on their persons or in close reach. For drug traffickers and firearms traffickers alike, the cellular phone has become a tool to facilitate criminal activity; specifically, the phone is used to arrange meetings with customers, to speak with fellow co-conspirators, and to coordinate with sources of supply.

30.     Based upon my training and experience, I am aware that it is generally a common practice for drug traffickers to store the names and phone numbers of drug customers and photographs and video detailing illegal activities in cellular telephones and electronic devices. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, and/or will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's supplier(s) and the trafficker's dealer(s). Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business.

31.     Members of Drug Trafficking Organizations (DTO's) often take group photographs with other enterprise members posing with paraphernalia, money, firearms and/or drugs. Many cellular telephones have a camera feature that is readily capable of capturing and storing these group photos.

32.     Members of DTO's often store each other's phone numbers and contact information in the directories of their cellular phones and/or electronic devices.

33.     Based on my experience and familiarity with cellular telephones, I am aware that cellular phones have voicemail and telephone directory features, as well as camera features which allow the user to take photographs and store them in the cellular phone's memory card. Based on my experience and training, statements by other law enforcement officers, and personal observations, I know that because of the storage capacity of cellular telephones, the portability of cellular telephones, the ease with which information stored on a cellular telephone may be accessed and/or organized, and the need for frequent communication in arranging narcotics transactions, cellular telephones are frequently used by individuals involved in drug trafficking. In particular, I and other law enforcement officers have found that information frequently maintained on cellular telephones includes the contact numbers of other co-conspirators, contact numbers for narcotics customers and stored photographs of DTO activities. This evidence will come in the form of caller identification information, call log information, telephone numbers, address information, or other identification information, as well as opened and unopened voicemail and/or text messages, photographs, videos and information about access to the Internet.

34.     Members of DTO's routinely use multiple physical phones in succession as one breaks or the DTO feels that the number associated with the phone is compromised to law enforcement. The physical phone may no longer be an active communicative device; however, many times, these old phones are not discarded as they possess value to the DTO. The replaced device contains within it the contact information for drug customers of the DTO, and many times, these phones are maintained as digital phone books should the new active phone become unusable or unavailable. Furthermore, these replaced phones are commonly kept in a relatively accessible location where either all or select members of the DTO can access the information should it become necessary. As stated above, members of DTOs routinely take photographs and/or

memorialize other information of evidentiary value within these replaced phones. As such, it is common to recover a multitude of otherwise inactive phones, especially at locations central to or important to the DTO. Furthermore, based upon training and experience, your Affiant knows that law enforcement may recover hidden or deleted data in cellular phones, even after a lengthy period of inactivity.

35.     I am further aware that firearms are "tools of the trade" for drug traffickers, as drug traffickers often rely on firearms to protect themselves, their drug stash, and their narcotics proceeds, from robbery and/or theft, as drug traffickers are often reluctant to contact law enforcement in the event they are the victim of any such crimes, and as such are often the targets of such crimes.

36.     Based on my training and experience, I am aware that individuals such as RICHARDSON, who cannot legally purchase firearms often have to either illegally purchase them "on the street," or contact third parties and request the third parties to purchase firearms for them (referred to as a "straw purchase").  I am aware that, in order to arrange/conduct either of these transactions, individuals often communicate via cellular phone with the firearms trafficker and/or straw purchaser.  In so doing, individuals often exchange photographs of firearms they have for sale, or internet links and/or photographs of firearms they want to purchase.

37.     I am similarly aware that individuals such as RICHARDSON will often conduct internet searches regarding firearms, to include firearms for sale in the area, to research and/or learn more about different types of firearms, and often to research the specific firearms in their possession.

38.     As set forth above, this affidavit also seeks authorization to extract data from the TARGET TELEPHONE to search that data for evidence of the TARGET OFFENSES.

39.     Based on my training and experience, the following types of evidence will likely be found on the TARGET TELEPHONE and another other cellular telephones located in the TARGET VEHICLE:

- Incoming and outgoing call, text and other chat application message logs;

- Contact lists;

- Calendars;

- Photo and video galleries and related metadata;

- Sent and received text, video and audio messages/files;

- Records related to online searches and sites viewed via the internet;

- Information revealing the user of the cellular telephone and the telephone number associated with the cellular telephone;

- Online or electronic communications sent and received, including email, chat, and instant messages;

- Records of FaceTime communications;

- Records related to location of the cellular telephone;

- Notes; and

- Voice messages.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

40.     As described above, this Application seeks permission to search the TARGET TELEPHONE and any other cellular telephone found in the TARGET VEHICLE for evidence of violations of the TARGET OFFENSES.

41.     Based on my knowledge, training, and experience, I know that files or remnants of such files can be recovered months or even years after they have been sent/received, accessed,

captured, downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files including photos or videos of firearms, downloaded to a storage medium can be stored for years at little or no cost. Similarly, chat communications can be stored locally on the device and are also able to be backed up to remote servers. Users can generally use these remote backups to recover deleted or lost communications.

42.     Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on an electronic device, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

43.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, an electronic device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

44.     Wholly apart from user-generated files, electronic device storage media—in particular, electronic devices' internal storage—contain electronic evidence of how an electronic device has been used, what it has been used for, where it was located, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Electronic device users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

45.     Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

46.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the cellular telephones consistent with the warrant. The examination requires technicians to extract data from the cellular telephones using forensic software.  That data will then be searched for the evidence described above.

47.     As the cellular telephones, assuming additional telephones are found within the TARGET VEHICLE, will be in law enforcement custody, I ask permission for law enforcement to search these devices at any time day or night.

## CONCLUSION

48.     Based on the facts above, I submit that there is probable cause to believe that evidence of the TARGET OFFENSES will be located in the TARGET VEHICLE as well as the TARGET TELEPHONE and any other cellular telephones located in the TARGET VEHICLE.


*/s/ Ryan P. O'Sullivan*
Ryan P. O'Sullivan, Special Agent
Bureau of Alcohol, Tobacco,
Firearms, And Explosives


Sworn to and subscribed to before me,
by telephone Pursuant to Fed. R. Crim. P.
4.1(b)(2)(A), this 21st day of November, 2025.


THE HONORABLE MAUREEN P. KELLY
UNITED STATES MAGISTRATE JUDGE

**Attachment A-1**

TARGET VEHICLE: a black Dodge Durango bearing PA registration LNH4149. The TARGET VEHICLE is currently in secure police custody at the Pittsburgh Bureau of Police (PBP) Auto Squad garage. Below is an image of the TARGET VEHICLE moments after the crash that occurred on November 20, 2025.



**Attachment A-2**

TARGET TELEPHONE: an Apple iPhone seized from Dior RICHARDSON on November 21, 2025. The TARGET TELEPHONE is currently secured at Pittsburgh Bureau of Police (PBP) Headquarters, and any cellular telephone located in the TARGET VEHICLE.

## **ATTACHMENT B**

## **SECTION I**

### *Items to be Searched and Seized from Search Locations other than Cellular Telephones*

Any and all evidence, instrumentalities, fruits, and contraband relating to violations of Title 21, U.S.C. § 841(a)(1), Title 18, U.S.C. § 922(g)(1) and Title 18, U.S.C. § 924(c), to include:

1. Controlled substances, including but not limited to cocaine base (crack cocaine), cocaine, fentanyl, methamphetamine, oxycodone and marijuana;

2. Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, stamp bags, heat-sealing devices, baking soda, cookware with residue, and dilutants;

3. Books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances and to monetary transactions involving the proceeds from the sale of controlled substances;

4. Personal books, papers, cell phones, and other electronic devices capable of sending/receiving communications and/or connecting to the internet (such as computers or tablets), as well as devices capable of storing digital content, such as USB/Flash Drives or external hard drives;

5. Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances, money laundering, and the criminal use of communication facilities; and

6. Firearms, ammunition, and other dangerous weapons;

7.  Firearm and ammunition components and accessories, such as Glock "switches," sights, flashlights, holsters, magazines, ammunition boxes, firearm boxes;

8.  Other evidence of gun possession such as documents pertaining to firing ranges, gun clubs, firearms/ammunition purchases, firearms component/accessories purchases, etc.;

9.  Identification evidence and/or indicia, such as cell phones, mail, deeds, leases, rental agreements, photographs, bills, identification documents, etc., that tend to identify the person(s) in residence, occupancy, control, or ownership of the premises;

10. Cash, currency, and records relating to the generation of income from the sale of controlled substances and the expenditure of such income, including money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, as well as consumer items such as expensive televisions and other electronic equipment, high-end vehicles, precious metals such as gold and silver, and precious gems such as diamonds (this evidence often is located in a safe) -- unexplained wealth is probative evidence of crimes motivated by greed, including trafficking in controlled substances.

**SECTION II**

*Items to be Searched for and Seized from Cellular Telephones*

Any and all evidence, instrumentalities, fruits, and contraband relating to violations of Title 21, U.S.C. § 841(a)(1), Title 18, U.S.C. § 922(g)(1) and Title 18, U.S.C. § 924(c), to include:

1.  Incoming and outgoing call, text and other chat application message logs;

2.  Contact lists;

3.  Calendars;

4.  Photo and video galleries;

5.  Sent and received text, video and audio messages/files;

6.  Records related to online searches and sites viewed via the internet;

7.  Information revealing the user of the cellular telephone and the telephone number associated with the cellular telephone;

8.  Online or electronic communications sent and received, including email, chat, and instant messages;

9.  Records of facetime communications;

10. Records related to location of the cellular telephone;

11. Notes; and

12. Voice messages.